UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:09-CV-00039

DOUGLAS BASSETT, on behalf of himself
and all others "similarly situated"                                          PLAINTIFF

v.

TENNESSEE VALLEY AUTHORITY                                                    DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the Defendant's motion to decertify the conditionally-certified class of plaintiffs alleging violations of the Fair Labor Standards Act. (Def.'s Mot., Docket Number ("DN") 111.) The named Plaintiff has responded. (Pl.'s Resp., DN 113.) The Defendant has replied. (Def.'s Reply, DN 117.) Fully briefed, this matter is now ripe for adjudication. Having considered the matter and being fully advised, the Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

I.

The named plaintiff, Douglas Bassett ("Bassett"), was employed by Defendant Tennessee Valley Authority ("TVA") from 1987 until his retirement in 2008. Throughout this period, he worked as a heavy equipment operator in the Project Services branch of TVA's Heavy Equipment Division. During his employment, Bassett was assigned to the TVA station in Paducah, Kentucky. Although Paducah served as his home station, Bassett was part of a dredging crew that traveled to remote TVA facilities and projects throughout the Tennessee Valley, a region following the Tennessee River and stretching across several southeastern states. These remote projects often lasted several weeks and required Bassett to travel away from home overnight.

Bassett brings this action alleging that TVA violated the Fair Labor Standards Act, 29

1

U.S.C. § 201 *et seq.*, by failing to pay him overtime wages.[1] He allegedly earned those wages during time he spent traveling to and from TVA's remote project locations. Specifically, he argues that he should have been paid overtime for travel time incurred during non-voluntary trips to and from Paducah on a remote project's interim weekends and other rest days (hereinafter "non-workdays"). He does not appear to dispute that he was compensated for his travel time during his first and last trips to and from a remote project, which occurred on both work and non-workdays. (*See* Mar. 10, 2011 Bassett Dep., DN 116-2, p. 9:15-20.) Nor does he dispute that he received a per diem for room and board on workdays at remote projects and that TVA paid him a mileage allowance for his travel to and from Paducah on non-workdays. Bassett does, however, vehemently contest TVA's claim that his travel to Paducah on non-workdays was voluntary. Furthermore, Bassett vigorously rebuts TVA's allegation that a per diem for room and board was available to him if he remained at a remote project on non-workdays. Bassett asserts that he did not know and could not have known that TVA would provide him a per diem for these periods. Finally, he claims that even if per diems were available under TVA policy on non-workdays, his supervisors refused to pay them.

Viewed from Bassett's prospective, he was left with two choices on non-workdays. He could either pay for room and board out of his own pocket or could drive home on the mileage allowance offered by TVA. Unable to afford room and board and support his family simultaneously, Bassett selected the latter option. Because he was never made aware that per diems were available for non-workdays, Bassett argues that his travel time during these periods was involuntary and should have been compensated by TVA as overtime when it exceeded his

---

[1] The FLSA generally provides that an employee is not to work "a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The wage and hour requirements of § 207 are subject to certain exemptions, including 29 U.S.C. §§ 213 and 254.

normal bulletined hours of forty hours per week.

The Court conditionally certified Bassett's claims as a FLSA collective action. *See Bassett v. TVA*, No. 5:09-CV-39, 2010 WL 716094, at *5-7 (W.D. Ky. Feb. 22, 2010). By way of an amended complaint, Bassett was ultimately identified as the representative plaintiff of a class including "all present and former employees who work or worked in Project Services for Defendant, TVA[.]" (Am. Compl., DN 88 ¶ 8.) After this action was conditionally certified, the parties conducted additional discovery relating to each of the fourteen opt-in plaintiffs. One goal of this discovery was to determine whether the opt-in plaintiffs were "similarly situated" to Bassett. If not similarly situated, then this case may not proceed collectively. Upon the completion of discovery, TVA now moves to decertify the class on grounds that the opt-in plaintiffs are not similarly situated to Bassett.

## II.

An employee alleging violations of the Fair Labor Standards Act may bring suit against his employer on "behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). A FLSA action on behalf of "similarly situated" employees is referred to as a "collective action." A FLSA collective action differs from a class action brought under Federal Rule of Civil Procedure 23. *See Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). "Unlike class actions under Fed. R. Civ. P. 23, collective actions under FLSA require putative class members to opt into the class." *O'Brien v. Ed Donnnelly Enters., Inc.*, 575 F.3d 567, 583 (6th Cir. 2009). Furthermore, the standard for certifying a collective action is less stringent than that required for a class action. *Id.* at 584. To certify a class action under Rule 23, the class representative must show that "issues subject to generalized proof and applicable to the class as a whole *predominate* over those issues that are subject to only individualized proof." *Randleman*

3

*v. Fid. Nat'l Title Ins. Co.*, 656 F.3d 347, 352-53 (6th Cir. 2011) (emphasis added). There is no "predominance" requirement for a FLSA collective action, and "opt-in plaintiffs only need to be 'similarly situated.'" *O'Brien*, 575 F.3d at 584.

In order to determine whether opt-in plaintiffs are similarly situated, the majority of district courts follow a two-step certification process. First, like the Court here, they conditionally certify the collective action after minimal discovery so that the lead plaintiff can issue notice to the putative class, allowing potential class members to opt into the action if desired. *See Bassett v. TVA*, No. 5:09-CV-39, 2010 WL 716094, *5-7 (W.D. Ky. Feb. 22, 2010). Second, after other plaintiffs have joined and additional discovery has been taken, courts conduct a final certification analysis to determine whether the plaintiffs are, in fact, similarly situated. At this stage, courts "require a higher level of proof than for initial conditional certification." 7B Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 1807 (3d ed. 2012). Here, certification "should not be based on any single factor in isolation, but on a variety of factors." *Id.* Indeed, in *O'Brien*, the Sixth Circuit stated that it was not "creat[ing] comprehensive criteria for informing the similarly-situated analysis." *O'Brien*, 575 F.3d at 585. The court did, however, identify three factors that are often examined in the second step of the certification analysis: 1) the factual and employment settings of the individual plaintiffs, 2) the different defenses to which the plaintiffs may be subject on an individual basis, and 3) the degree of fairness and procedural impact of certifying the action as a collective action. *Id.* at 584 (citing 7B Wright, *supra*, § 1807).

Again, the "similarly situated" requirement for a FLSA collective action is less stringent than the "predominance" requirement for a Rule 23 class action. "Plaintiffs are not required to show a 'unified policy' by the defendant in order to be similarly situated." *Monroe v. FTS USA,*

4

*LLC*, 763 F. Supp. 2d 979, 994 (W.D. Tenn. 2011) (quoting *O'Brien*, 575 F.3d at 584). Rather, when "considering decertification, '[t]he question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected.'" *Id.* (quoting *Frye v. Baptist Mem'l Hosp.*, No. CIV 07-2708-Ma, 2010 WL 3862591, at *3 (W.D. Tenn. Sept. 27, 2010)). The named plaintiff bears the burden of demonstrating that the opt-in plaintiffs are similarly situated to him. *O'Brien*, 575 F.3d at 584 (citing 7B Wright, *supra*, § 1807).

Finally, where a subset of the opt-in plaintiffs is not similarly situated, partial decertification is possible. *Id.* at 586. A collective action need not be "totally decertified if some members are not similarly situated to the others." *Id.* Instead, "plaintiffs who are not similarly situated . . . [can] be dismissed while keeping intact the partial class." *Id.* Allowing those opt-in plaintiffs who are similarly situated to the lead plaintiff to proceed as members of a partially certified class preserves the remedial nature of the FLSA and such plaintiffs "should not be barred from the opportunity to be part of a FLSA collective action[.]" *Id.* "[I]f final certification is granted, the action proceeds to trial on a representative basis." 7B Wright, *supra*, § 1807.

## III.

The Court must determine whether the opt-in plaintiffs are "similarly situated" to Bassett. To do so, the Court considers the three factors discussed above: 1) the factual and employment settings of the individual plaintiffs, 2) the different defenses to which the plaintiffs may be subject on an individual basis, and 3) the degree of fairness and procedural impact of certifying the action as a collective action. *O'Brien*, 575 F.3d at 584 (citing 7B Wright, *supra*, § 1807).

## A.

TVA first argues that the opt-in plaintiffs are not "similarly situated" to Bassett because

their factual and employment setting are not similar to his own. The Court briefly examines the facts as they relate to the fourteen opt-in plaintiffs. For those plaintiffs who do not share factual and employment similarities with Bassett, the Court dismisses them as discussed below.

**1. James Bagwell**

James Bagwell ("Bagwell") was an annual TVA employee who served as a heavy equipment operator for a number of years. (Bagwell Dep., DN 111-13, pp. 17:20-21:4.) The job required Bagwell to travel away from home overnight. (*Id.* at p. 22:16-23.) His normal work hours were 7:00 a.m. to 3:30 p.m., five days a week. (*Id.* at p. 60:11-22.) He also frequently worked four ten-hour shifts, Tuesday through Friday. (*Id.* at pp. 67:24-69:23.) Bagwell typically left his home between 1:00 p.m. and 2:00 p.m. on the day before he was to begin work at a remote project. (*Id.* at p. 69:10-23.) He remained at the project throughout the workweek and immediately drove home after completing his last shift on Friday. (*Id.* at pp. 61:20-62:6.)

Bagwell's deposition testimony shows that he had access to TVA's travel policy, even if he did not know the policy provided per diems on non-workdays. For example, Sonya Jones, a TVA administrative assistant, trained him on how to fill out the correct travel reimbursement forms and could answer other questions about travel reimbursement. (*Id.* at pp. 24:18-25:15, 40:7-15.) Bagwell also had access to TVA's policies through his supervisors, Larry Radford and Kenny Lowery. (*Id.* at pp. 40:16-41:1.) Finally, Bagwell can recall using a TVA-issued laptop to look up various work policies. (*Id.* at pp. 41:2-43:15.) He never requested a per diem for non-workdays. (*Id.* at pp. 116:24-117:4.) That said, he clearly testified that TVA's policy of providing per diems on non-workdays was never related to him and he was not aware of that option. (*Id.* at pp. 126:13-127:6).

Larry Radford was Bagwell's supervisor during the time periods relevant to this action.

6

(*Id.* at pp. 16:1-17:13.)  When he first began working for TVA, Bagwell sought compensation for his time spent in travel on non-workdays, but Radford refused to pay it.  (*Id.* at p. 28:8-25.)  Radford informed him that his work group only received travel time for trips at the beginning and end of a remote project, not on the interim non-workdays.  (*Id.* at p. 29.)  Neither Radford nor the other supervisors ever offered Bagwell per diems for non-working days at a remote project.  (*Id.* at p. 113:1-22.)  Bagwell only received per diems on the days he was actually working.  (*Id.* at pp. 31-33.)

### 2. Wesley Baird

Wesley Baird ("Baird") was employed by TVA as a construction foreman from 2001 to 2009.  (Baird Dep., DN 111-11, p. 13.)  Baird's position required travel away from home overnight.  Once on site, he worked 7:00 a.m. to 5:00 p.m., Monday through Thursday.  (*Id.* at p. 19:10-17).  His usual practice was to leave his home between 5:30 and 5:45 p.m. on Sunday and drive to the remote project.  (*Id.* at p. 18:22-25.)  When he finished his shift on Thursday, he would travel home.  (*Id.* at pp. 18:19-21, 19:14-17.) Larry Radford was also Baird's supervisor.  TVA's policies were available to Baird through Sonya Jones.  (*Id.* at p. 33:3-21.)  He also possessed a manual containing the policies.  (*Id.* at 42:3-6.)

Baird had numerous discussions with Larry Radford about payment for travel time on non-workdays because other divisions and employees within the TVA were apparently compensated for that time although Baird and other employees under Larry Radford were not.  (*Id.* at pp. 22:4-24:1).  Radford told Baird that if the employees did not like the arrangement they could find another job.  (*Id.* at p. 24:1.)  The employees and supervisors in Radford's work group met collectively three or four times a year.  (*Id.* at p. 26:10-11.)  The issue of travel time on non-workdays was discussed at these meetings and the supervisors made clear that Baird and his

7

fellow employees would not be compensated for their travel time on non-workdays. (*Id.* at p. 25:13-25.) During the course of these meetings, the supervisors never told Baird or the other employees that they would receive per diems for non-workdays if they stayed at a remote project. (*Id.* at p. 26:15-22.) Occasionally, Baird asked Sonya Jones if he could stay at a hotel on non-workdays. (*Id.* at p. 36:13-16.) Following Larry Radford's instructions, she always denied the request. (*Id.* at p. 36:19-22.) In all, Baird testified that it was well-understood that if members of the dredging crew were not working they had to return home on non-workdays. (*Id.* at p. 28:7-9.)

### 3. Jason Goodman

Jason Goodman ("Goodman") was employed from 2005 to 2009 by TVA through GUBMK, a contractor supplying laborers to TVA's various remote projects. (Goodman Dep., DN 111-18, p. 8:4-10.) His employment required him to travel away from home overnight. Goodman typically worked five days a week from 6:30 a.m. until 5:00 p.m. (*Id.* at p. 28:2-13.) His usual practice was to leave his home around 5:00 p.m. on the Sunday before work at a remote project and return home from the project after completing his last shift for the week. (*Id.* at p. 28:14-15.) He worked on dredging crews supervised by Larry Radford.

During his deposition, Goodman acknowledged that he was told prior to taking jobs with the TVA that he would receive mileage for driving to and from remote projects but would not be paid hourly compensation for his travel time. (*Id.* at p. 21:3:23.) That said, he also testified that he had to cover his own expenses if he remained at a remote project on non-workdays. (*Id.* at p. 24:8-25.) He only received per diems for his expenses on days he actually worked. No evidence has been presented that tends to show per diems were ever offered or made available to him for non-workdays.

### 4. Bobby Holder

Bobby Holder ("Holder") was another laborer contracted to TVA through GUBMK. (Holder Dep., DN 111-19, pp. 16:7-17:13.) He worked under the supervision of Larry Radford during his employment. (*Id.* at p. 49.) His normal working hours were 7:00 a.m. to 5:30 p.m., Monday through Thursday. (*Id.* at p. 45:6-12.) His work at remote projects required him to travel away from home overnight. His standard practice was to leave home around 1:30 p.m. on Sunday and return home on Thursday once he completed his shift. (*Id.* at pp. 42-44.)

After going to work for TVA, Holder asked Kenny Lowery – a manager under Larry Radford's supervision and an opt-in plaintiff in this action – about compensation for travel time to and from remote projects on non-workdays. (*Id.* at p. 55:7-13.) According to Holder, Lowery stated that TVA was supposed to compensate its employees for travel time, but that Larry Radford refused to pay it for the employees under his supervision. (*Id.* at pp. 52-53.) Holder also testified that neither Larry Radford nor any of the other TVA supervisors told him that per diems were available on non-workdays. (*Id.* at pp. 105-106.)

### 5. Kenny Lowery

Kenny Lowery ("Lowery") was employed by TVA as the regional manager of TVA's Heavy Equipment Division from 2005 until he retired in 2010. (Lowery Dep., DN 111-21, p. 14:20-21.) In that role, his job description and duties were quite different than Bassett's. Unlike Bassett, who was a heavy equipment operator, Lowery was responsible for "preparing estimates, and developing a budget, developing a cash flow, getting materials, equipment, manpower, and overseeing the projects and making sure it was done on schedule." (*Id.* at p. 16:10-14.)

As discussed below in the section considering the individualized defenses to which the plaintiffs may be subject, TVA argues that Lowery is exempt from the FSLA because he was

employed in a "bona fide executive, administrative, or professional capacity[.]"  29 U.S.C. § 213(a)(1).  To the extent that the Court agrees with TVA's position, Lowery has agreed to opt out of this collective action.  (*See* Lowery Aff., DN 113-2.)

### 6. William Luffman

William Luffman ("Luffman") was employed by TVA through GUBMK at various remote projects between 2006 and 2009.  (Luffman Dep., DN 111-23, p. 13:14-16.)  He was a heavy equipment operator.  (*Id.* at pp. 13:19-14-4.)  In that position, he was supervised by Larry Radford.  (*Id.* at p. 41.)  He normally worked four ten-hour shifts, from 7:00 a.m. to 5:30 p.m., Monday through Thursday.  (*Id.* at p. 85:3-4, 91:7-9.)  To reach the remote project locations, Luffman would leave his home between noon and 1:00 p.m. on Sunday afternoon.  (*Id.* at pp. 89:1-3.)  He would return home on Thursday after completing his shift.

Luffman testified that he only received per diems for days he actually worked.  (*Id.* at p. 55:5-15.)  He was never offered a per diem or paid for his travel time on non-workdays.  (*Id.* at pp. 91:24-92:9.)  Despite testimony by Larry Radford and other TVA supervisors to the contrary, Luffman testified that none of the supervisors ever told him that per diems were available for non-workdays.  (*Id.* at p. 92:4-9.)

After Larry Radford retired, but while Luffman was still working as a superintendent, he was instructed by Brad Workman, Radford's replacement, to pay workers for their travel time on non-workdays.  (*Id.* at pp. 42-43, 96.)  Luffman testified that this was a shift from previous practice.  (*Id.*)

### 7. David Miller

David Miller ("Miller") was employed by TVA from 1991 until 2009.  (Miller Dep., DN 111-9, p. 5:7-10.)  His position required frequent travel away from home overnight.  (*Id.* at p.

10

11:3-23.) Larry Radford was Miller's supervisor during the relevant periods of his employment. (*Id.* at pp. 12, 14.) Miller was not paid for his time spent traveling on non-workdays.

Miller testified that he was paid for travel time on non-workdays when working for other TVA managers, but not when working for Radford. (*Id.* at p. 33.) During his years of employment with TVA, Miller only recalls one occasion on which Larry Radford offered him a per diem for expenses on a non-workday. (*Id.* at p. 16:1-9.) This was apparently a one-time exception, however. (*Id.*) Miller claims the general practice in Radford's work group was not to pay per diems or travel time for non-workdays. (*Id.* at p. 44.) According to Miller, this practice stemmed from a 1992 meeting between Radford and his employees in which the employees asked about compensation for travel time on non-workdays. Radford allegedly told them they could "shut up [about the subject] or go home," which Miller interpreted to mean they would be terminated if they continued to ask about payment of travel time on non-workdays. (*Id.* at p. 16:19-22.)

### 8. Lanny Reed

Lanny Reed ("Reed") was employed by TVA through GUBMK and Stone & Webster prior to this death in 2009. (Craig Dep. at p. 28.) Mabel Craig, Reed's common law wife, opted-in on behalf of Reed after his death. (Reed Opt-in Form, DN 83-25.) Reed's probate estate closed on January 28, 2011. (Craig Dep. at pp. 52:18-53:14.) Craig, who served as the personal representative of Reed's estate, did not pursue this action on behalf of the estate and has not moved to reopen the estate to do so. (*Id.* at pp. 53:15-54:6.) Nor has she timely moved to substitute parties as required by Federal Rule of Civil Procedure 25(a). Without doing so, she may not maintain this action on Reed's behalf. All claims by Lanny Reed are **DISMISSED WITHOUT PREJUDICE** and he is no longer a member of the conditionally-certified class.

### 9. Robert Rodocker

Robert Rodocker ("Rodocker") was employed by TVA as a dual-rate foreman until 2008. (Rodocker Dep., DN 111-8, p. 35.) In this position he was often required to travel away from home overnight. (*Id.* at pp. 56:23-57:4.) Like the other plaintiffs, Larry Radford served as Rodocker's supervisor. He was never paid for his travel time to and from remote projects on non-workdays. (*Id.* at p. 57:8-21.) For remote projects, his typical travel practice was to leave home on Sunday and return on Thursday after completing his shift. (*Id.* at p. 74:12-25.)

As to the issue of per diems on non-workdays, Rodocker recalls a three month period prior to 2006 when he complained to Larry Radford about having to drive eight hours to and from a remote project on the weekends. (*Id.* at pp. 61:15-68:2.) Radford agreed to pay Rodocker per diems for non-workdays during this period and he did not travel to and from home. (*Id.*) But as Rodocker explained in this deposition, he did not feel that Radford was offering to pay him per diems during this period because it was required by TVA policy (*Id.*) Rather, Rodocker explained that "it was like [Radford] was doing me a favor." (*Id.* at p. 67:23-24.) This was a verbal agreement between Rodocker and Radford and was apparently not repeated at other remote projects. (*Id.* at pp. 58:22-59:17.)

### 10. Carlton Smith

Carlton Smith ("Smith") was employed by TVA through GUBMK at various remote projects between 2006 and 2009. (Smith Dep., DN 111-27, pp. 14:24-15:4.) His regular work schedule was 6:30 a.m. to 5:30 p.m., Monday through Thursday. (*Id.* at pp. 40:19-41:8.) To reach a remote project, Smith would leave his home on Sunday evening. (*Id.* at p. 51:14-24.) He would then return home on Thursday after completing his shift. (*Id.* at p. 52:7-10.) He was never paid for his travel time to and from home. (*See id.* at p. 40:9-12.) Smith was supervised

by Larry Radford during his employment.  (*Id.* at p. 13:2-6.)

Smith was told that he would only receive per diems for expenses on days he was actually working.  (*Id.* at p. 53:2-6.)  Smith was informed that when he was not working he should return home.  (*Id.* at p. 53:20-25.)

### 11. Chad Stiles

Chad Stiles ("Stiles") was employed by TVA as a crane and bulldozer operator through TVA's various labor-contracting partners.  (Stiles Dep., DN 111-28, p. 13:7-12.)  He often commuted from home to work each day.  (*Id.* at p. 18:13-15.)  To the extent he did so, this travel was "ordinary home to work travel," which is not compensable under the FLSA and its implementing regulations. *See* 29 U.S.C. § 254(a)(1); 29 C.F.R. § 785.35.  He also testified, however, that when he drove more than two hours in one direction to reach a project he would sometimes stay in a hotel, but that this was "very seldom."  (Stiles Dep., DN 111-28, p. 20:4-19.)  Unlike some of the other plaintiffs, Stiles did not testify that he was denied or even requested payment for his travel time on the rare occasions he stayed away from home overnight.  Likewise there is no evidence that he requested or was denied per diems for those occasions.  As a result, the Court finds he is not similarly situated to Bassett.  All claims by Chad Stiles are **DISMISSED WITHOUT PREJUDICE** and he is no longer a member of the conditionally-certified class.

### 12. Jack Thompson

Jack Thompson ("Thompson") was employed by TVA through GUBMK at various remote projects between 2006 and 2007.  His job required him to travel away from home overnight.  He worked the night shift on a dredging crew, which typically lasted from 4:30 p.m. to 3:00 a.m., Monday through Thursday.  (Thompson Dep., DN 111-29, pp. 20:15-212.)  To get

to the remote projects, Thompson would leave his home around 8:00 a.m. on Monday morning, arriving at the work site by 3:00 p.m. (*Id.* at p. 20:6-13.) When his shift ended at 3:30 a.m. on Thursday morning, he would drive directly home. (*Id.* at p. 22:14-21.) Thompson's supervisor during this period was Ricky Lynn, who reported to Larry Radford. (*Id.* at p. 27:6-21.)

Thompson was never paid for his travel time to and from remote projects on non-workdays. He was allegedly told by employees at TVA's Widow Creek facility that he would be paid for his travel time. (*Id.* at p. 38.) When Thompson asked his supervisor, Ricky Lynn, about compensation for travel time, he was told that he would not be paid for travel time and if he was displeased with the result he could quit. (*Id.* at pp. 31-32.) Later, Thompson asked opt-in Plaintiff Kenny Lowery, a supervisor below Ricky Lynn, about compensation for travel time. Lowery supposedly told Thompson that he could get paid for travel time but that Lynn would deny the request. (*Id.* at pp. 46-47.) Additionally, Thompson requested but was denied per diems for remaining at remote projects on non-workdays. (*See id.* at pp. 119, 120.) When he chose to stay at a remote project on non-workdays his expenses were paid out of his own pocket. (*Id.*) As to Ricky Lynn's testimony that that he told employees that per diems were available on non-workdays, Thompson testified that such testimony was false and he was never offered per diems on non-workdays. (*Id.* at p. 33.)

### 13. Larry Warren

Larry Warren ("Warren") was employed by TVA through GUBMK at various remote projects between 2005 and 2008. (Warren Dep., DN 111-10, pp. 5, 12.) His job required him to travel away from home overnight. He was supervised by both Ricky Lynn and Larry Radford during his employment. (*Id.* at pp. 5:16-6:18.) Sometime during 2005, Warren asked Lynn about receiving compensation for traveling to and from remote projects on non-workdays. Lynn

14

told him that he would not be paid for travel time, and Warren did not inquire further about the issue. (*Id.* at p. 8:11-21.) Warren made the same inquiry of Larry Radford, but as also told that travel time would not be compensated. (*Id.* at p. 26.)

Sometime after June of 2008, Ricky Lynn informed Warren that he could receive per diems for expenses incurred on non-workdays at remote projects. (*Id.* at pp. 38:24-39:25.) Prior to that time, Warren had never been informed that he could receive per diems on non-workdays. (*Id.* at p. 38:1-4.) This change in policy came as a shock to Warren, and the Plaintiffs allege that the change only occurred after named-plaintiff Bassett notified TVA of his intent to file a lawsuit in June of 2008. (*Id.* at pp. 36-37.)

### 14. Charlene Webb

Charlene Webb ("Webb") was a temporary laborer employed by TVA through various contractors. Since opting into this action, she has declined to respond to discovery requests and has not appeared for a deposition scheduled on three different occasions. Accordingly, little is known about the employment and factual setting surrounding Webb's employment at TVA. There is no evidence upon which the Court could determine whether she is similarly situated to Bassett. As a result, the Court must dismiss her from this action. All claims by Charlene Webb are **DISMISSED WITHOUT PREJUDICE** and she is no longer a member of the conditionally-certified class.

Upon review of the employment and factual setting surrounding each opt-in plaintiff, the Court finds that neither Lanny Reed, Chad Stiles, nor Charlene Webb are similarly situated to named-plaintiff Douglas Bassett. These opt-in plaintiffs have either failed to respond to discovery, have not properly substituted parties, or were employed in circumstances so factually different from Bassett that they cannot be considered "similarly situated."

15

The remaining plaintiffs collectively claim that they either lacked actual or constructive knowledge that per diems were available on non-workdays or that their supervisors denied per diems when requested. Because per diems were not available, they claim that they had no choice but to travel home on non-workdays and that this lack of options made their travel time non-voluntary and compensable under the FLSA.

### B.

Next, TVA moves to decertify the collective action on grounds that the inquiries the Court will be required to perform when trying this action are highly individualized and as a result Bassett is not similar situated to the opt-in plaintiffs. For example, TVA argues that the Court must apply plaintiff-specific defenses, determine whether each plaintiff had actual or constructive knowledge of TVA's travel policies, and weigh each plaintiff's credibility.

In *O'Brien*, the Sixth Circuit guided that a court should consider "the different defenses to which the plaintiffs may be subject on an individual basis" when determining whether the opt-in plaintiffs are "similarly situated." *Id.* at 584 (citation omitted). In this case, TVA argues that the plaintiffs are not similarly situated because at least one plaintiff, Kenny Lowery, was employed by TVA in a bona fide executive, administrative, or professional capacity and is exempt from the FLSA. TVA does not raise this defense as to any other opt-in plaintiffs and admits that lead plaintiff Bassett was not employed in an exempt position. Rather than arguing that he is not exempt, Lowery has offered to opt-out if his continued presence in the collective action might subject the remaining plaintiffs to decertification. (*See* Lowery Aff., DN 113-2.) Upon review of the record, the Court finds that Lowery is not similarly situated to Bassett or the other opt-in plaintiffs because he may be subject to an FLSA exemption. The Court makes no determination as to whether Lowery is actually exempt. Rather, he should be excluded from this

collective-action because he is the only opt-in plaintiff subject to this specific defense raised by TVA. Accordingly, all claims by Kenny Lowery are **DISMISSED WITHOUT PREJUDICE** and he is no longer a member of the conditionally-certified class.

TVA's arguments regarding each plaintiff's actual or constructive knowledge of TVA policies and his or her credibility raise more difficult issues. Relying primarily on *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 964-65 (W.D. Mich. 2009), TVA argues that FLSA claims requiring a court to make credibility determinations must be decertified because credibility is an individual determination unique to each opt-in plaintiff and the named plaintiff's credibility should not be imputed to the class. *Pacheco* was a "donning and offing" case where the plaintiffs sued to recover unpaid wages for time they spent putting on and taking off protective gear required for their jobs. *Id.* at 958-59. The court found that the defendant company had a FLSA-compliant policy regarding time spent donning and doffing protective gear, and, as a result "the Plaintiffs' allegations of a uniform company practice of not paying for donning and doffing activities rests particularly on the Plaintiffs' credibility." *Id.* at 964. The court found many discrepancies between the named plaintiffs' deposition testimony and their affidavits. *Id.* at 965. These discrepancies demonstrated "'the importance of cross-examination of each plaintiff' and suggest[ed] 'the need for separate mini-trials to resolve each individual's claims.'" *Id.* (quoting *Hinojos v. Home Depot, Inc.*, No. 2:06-CV-108, 2006 WK 3712944, at *2 (D. Nev. Dec. 1, 2006)). Ultimately, the court decertified the FLSA collective action.

In contrast to *Pachecho*, the court in *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979 (W.D. Tenn. 2011), certified a collective action even though individual credibility determinations were at issue. In *Monroe*, cable television installation technicians alleged that their supervisors violated the FLSA by not allowing them to include certain work hours on their

17

time sheets and even went so far as to alter their time entries after submission. *Id.* at 983-84. The defendants argued that the collective action should not be decertified "because the finder of fact must assess the credibility of each plaintiff individually as to how much, if any, uncompensated overtime he or she worked." *Id.* at 995. Basing its decision on the remedial policy underlying the FLSA, the court found that the use of representative testimony would not impair the defendants' ability to address the credibility issue. *Id.* at 996. As the court explained:

> While it will not afford the same level of forensic specificity as cross-examination of each plaintiff individually, a collective action under § 216(b) is not held to the same rigors as either a typical lawsuit or a class action under Rule 23 precisely because the FLSA contemplates that representative testimony may be used to adjudicate the claims of nontestifying plaintiffs and thereby arrive at an approximation of damages.

*Id.* (citing *O'Brien*, 575 F.3d at 585) (other citations omitted).

The Court finds *Monroe* to be more persuasive than *Pacheco* and factually closer to the circumstances presented by this FLSA action. Bassett's deposition testimony does not appear to suffer from the discrepancies that concerned the court in *Pacheco*. His testimony is substantially similar to the testimony of the remaining opt-in plaintiffs. All plaintiffs alleged that they lacked actual or constructive knowledge of TVA's policy providing per diems on non-workdays and that when they inquired about per diems on non-workdays, TVA supervisors, namely Larry Radford, summarily dismissed those requests. As a result, they claim that their travel time on non-workdays was non-voluntary and should have been compensated as overtime. Given the consistency of their testimony and their uniform theory of TVA's liability, TVA's arguments concerning the individualized nature of the opt-in plaintiffs' claims are not as persuasive as they might be in other contexts or under other factual circumstances.

## C.

Finally, TVA argues that this action must be completely decertified because allowing it to

18

proceed collectively would be inefficient and prejudicial to TVA. This argument relies on *O'Brien*, which guided that courts should consider the degree of fairness and procedural impact when determining whether to allow a claim to proceed as a collective action. *See O'Brien*, 575 F.3d at 584. The majority of TVA's fairness arguments center on plaintiffs that have been dismissed from this action in the foregoing discussion. Thus, the prejudice TVA might have perceived has been ameliorated by dismissal of those plaintiffs who were not similarly situated to Bassett and who were potentially subject to individualized defenses.

*Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. 06-299-JBC, 2008 WL 2885230, at *11-12 (E.D. Ky. July 22, 2008), provides a cogent analysis of factors courts address when considering fairness and procedural impact. When considering these issues, courts must bear in mind that "the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Id.* at *11 (citations omitted). Courts should also remember that the FLSA is intended to be "broadly remedial and humanitarian" and that while this alone does not justify collective actions "it does at least suggestion that a close call as to whether plaintiffs are similarly situated should be resolved in favor of certification." *Id.* (citations omitted).

In the present case, the Court has, through the present opinion, narrowed the class in such a way that the remaining opt-in plaintiffs' claims are substantially similar to those asserted by Bassett. To decertify at this point would place the opt-in plaintiffs back at square one without the benefit of pooled resources and would likely cause multiple trials of issues that may be easily resolved in one proceeding before this Court. To decertify at this stage would be "antithetical to the policy behind collective actions under § 216(b) of the FLSA: allowing plaintiffs to vindicate

19

their rights by efficient resolution in one proceeding of common issues of law and fact arising from the same improper practice." *Kautsch v. Premier Commc'ns*, No. 06-cv-04035-NKL, 2008 WL 294271, at *4 (W.D. Mo. Jan. 31, 2008). Accordingly, the factors of fairness and procedural impact weigh in favor of certifying this collective action.

## CONCLUSION

Defendant TVA moved to decertify this FLSA collective-action. For all of the foregoing reasons, TVA's motion is **GRANTED IN PART** and **DENIED IN PART**. Opt-in Plaintiffs Lanny Reed, Chad Stiles, Charlene Webb, and Kenny Lowery are **DISMISSED WITHOUT PREJUDICE**. The Court finds that the other opt-in plaintiffs are similarly situated to named plaintiff Douglas Basset for the purposes of 29 U.S.C. § 216(b) and that this action will proceed collectively.