### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION
### CASE NO. 5:09-CV-00039

**DOUGLAS BASSETT, on behalf of himself
and all others "similarly situated"**                                         **PLAINTIFFS**

**v.**

**TENNESSEE VALLEY AUTHORITY**                                          **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Defendant's renewed motion for summary judgment. (Def.'s Mot. Summ. J., Docket Number ("DN") 116.) The Plaintiff has responded. (Pl.'s Resp., DN 122.) The Defendant has replied. (Def.'s Reply, DN 124.) Fully briefed, this matter is now ripe for adjudication. For the following reasons, the Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

### I.

Plaintiff Douglas Bassett ("Bassett") was employed by Defendant Tennessee Valley Authority ("TVA") from 1987 until his retirement in 2008. Throughout this period, he worked as a heavy equipment operator in the Project Services branch of TVA's Heavy Equipment Division. During his employment, Bassett was assigned to the TVA station in Paducah, Kentucky. Although Paducah served as his home station, Bassett was part of a dredging crew that traveled to remote TVA facilities and projects throughout the Tennessee Valley, a region following the Tennessee River and stretching across several southeastern states. These remote projects often lasted several weeks and required Bassett to travel away from home overnight.

Bassett brings this case alleging that TVA violated the Fair Labor Standards Act, 29

U.S.C. § 201 *et seq.*, by failing to pay him overtime wages.[1]  He allegedly earned those wages during time he spent traveling to and from TVA's remote project locations.  Specifically, he argues that he should have been paid overtime for travel time incurred during non-voluntary trips to and from Paducah on a remote project's interim weekends and other rest days (hereinafter "non-workdays").  He does not appear to dispute that he was compensated for his travel time during his first and last trips to and from a remote project, which occurred on both work and non-workdays.  (*See* Mar. 10, 2011 Bassett Dep., DN 116-2, p. 9:15-20.)  Nor does he dispute that he received a per diem for room and board on workdays at remote projects and that TVA paid him a mileage allowance for his travel to and from Paducah on non-workdays.  Bassett does, however, vehemently contest TVA's claim that his travel to and from Paducah on non-workdays was voluntary.  Furthermore, Bassett vigorously rebuts TVA's allegation that a per diem for room and board was available to him if he remained at a remote project on non-workdays.  Bassett asserts that he did not know and could not have known that TVA would provide him a per diem for these periods.  Finally, he claims that even if per diems were available for non-workdays, his supervisors refused to pay them.

Viewed from Bassett's prospective, he was left with two choices on non-workdays.  He could either pay for room and board out of his own pocket or could drive home on the mileage allowance offered by TVA.  Unable to afford room and board and support his family simultaneously, Bassett selected the latter option.  Because he was never made aware that per diems were available for non-workdays, Bassett argues that his travel time during these periods was involuntary and should have been compensated by TVA as overtime when it exceeded his

---

[1] The FLSA generally provides that an employee is not to work "a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  The wage and hour requirements of § 207 are subject to certain exemptions, including 29 U.S.C. §§ 213 and 254.

normal bulleted hours of forty hours per week.  The Court conditionally certified Bassett's claims as a collective FLSA action, *see Bassett v. TVA*, No. 5:09-CV-39, 2010 WL 716094, at *5-7 (W.D. Ky. Feb. 22, 2010), and he currently represents fourteen opt-in plaintiffs who maintain similar claims.[2]

TVA now renews its motion for summary judgment and seeks to dispose of this action on three grounds: 1) Bassett's claims fail as a matter of law because his travel time on non-workdays was not "work" as that term is used in the FLSA; 2) his travel time to and from Paducah on non-workdays was voluntary; and 3) the Court lacks jurisdiction to hear this case because Bassett failed to exhaust the grievance procedures set forth in the collective-bargaining agreement between his union and TVA.

## II.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby,*

---

[2] TVA's also moved to decertify the conditionally-certified class.  (*See* Def.'s Mot., DN 111.)  On the date of this memorandum opinion and order, the Court issued a separate memorandum opinion and order granting the motion in part.  The Court dismissed a number of plaintiffs who were not "similarly situated" to Bassett.

*Inc.*, 477 U.S. 242, 252 (1986)).  The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

### III.

Before considering the merits of TVA's motion, the Court pauses to address the interaction between the FLSA, its implementing regulations, and the collective-bargaining agreement at issue in this case.

As a general rule, an employer is not required to pay wages or overtime compensation for time an employee expends "walking, riding, or traveling to and from the actual place of the principle activity or activities which such employee is employed to perform."  29 U.S.C. § 254(a)(1).  Such "ordinary home to work" travel time is not a compensable incident of employment.  *See* 29 C.F.R. § 785.35 ("Normal travel from home to work is not worktime."). This rule is subject to two relevant exceptions, however.

### A.

The first exception is found in 29 U.S.C. § 254(b)(1).  Under that statute, an employer is obligated to compensate an employee for his travel time to and from work where the employer has agreed to do so by "an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer."  29 U.S.C. § 254(b)(1).  In other words, "travel time at the commencement or

4

cessation of the workday which was originally considered as working time under the [FLSA] need not be counted as working time unless it is compensable by contract . . . ."  29 C.F.R. § 785.34.  Bassett alleges that such a contract exists in this case.

Bassett was a member of the International Unit of Operating Engineers and was therefore covered by the General Agreement and Supplementary Schedules Between Tennessee Valley Authority and the Trades and Labor Council for Annual Employees of the Tennessee Valley Authority ("General Agreement").   Regarding travel time, the General Agreement states as follows:

**B-X. Pay for Time Spent in Travel**

A. Time spent in travel by an employee when required to travel between his/her official station and a field assignment is paid for as follows:

1. An employee required to travel during regular bulletined hours is paid at the rate he/she would have received if he/she had worked those hours.

2. An employee required to travel outside of regular bulletined hours of work and on scheduled rest days is paid for time spent in travel at the applicable overtime rate, except that when Pullman sleeping accommodations are provided, payment is not made for more than eight hours' travel time in a calendar day nor between the hours of 7 p.m. and 8 a.m....

3. The travel time paid for is limited to the time reasonably required to make the trip from one work location to the next work location by the most direct route by the means provided by TVA. For travel by automobile outside of regular bulletined hours, the maximum travel time paid for is computed by allowing time on the basis of a half hour for each 20 miles of travel or major fraction thereof.

4. An employee whose place of abode is closer to a field assignment than is his/her official station and who travels daily from his/her place of abode to a field assignment is not entitled to pay for time spent in travel.

(General Agreement, DN 122-2, p. 11.)  Relying on this section, Bassett argues that he is owed overtime wages for travel time on non-workdays because TVA contractually agreed to pay it.

Two other General Agreement provisions are worthy of note.  First, Section XIV –

"Procedure for Revising Contract Language" – provides that "[r]ates of pay, hours of work, other working conditions, and other negotiated understandings established under this Agreement shall be in the form of supplementary schedules attached hereto." (*Id.* at p. 2.) Bassett claims that this is a legally binding "zipper clause" that prohibits oral modification of the General Agreement. Claiming that the General Agreement is silent as to the availability of per diems, Bassett argues that TVA's assertion that per diems were orally made available to him on non-workdays by certain supervisors is without merit and not in accord with the agreement's terms.

In apparent anticipation of this argument, TVA, in its opening brief, points to the second noteworthy provision, Section B-XVI – "Nonnegotiated Items Established by Federal Laws and Regulations." That section states, "Annual employees are granted benefits in accordance with applicable federal laws and regulations on the following subjects . . . 5. Official travel . . . ." (General Agreement, DN 116-8, p. 4.) Relying on this section, TVA argues that there was no oral modification of the agreement because the federal regulations concerning the provision of travel allowances and per diems found in 41 C.F.R. Chapter 301 of the Federal Travel Regulation Systems[3] are incorporated by reference into the General Agreement, making per

---

[3] The Federal Travel Regulations found in 41 C.F.R. Chapter 301 are applicable to TVA because it is an "agency" as that term is defined in the regulations. Before setting forth the substance of the travel regulations, Chapter 301 – "Temporary Duty (TDY) Travel Allowances" – first addresses the agencies to which the regulations apply. Under 41 C.F.R § 301-1.1, an "agency" includes:

An Executive agency, as defined in 5 U.S.C. 105 (except for Government-Controlled Corporations,
   i.e., mixed ownership Government Corporations as defined in 31 U.S.C. 9101)
A military department
An office, agency or other establishment in the legislative branch
The Government of the District of Columbia[.]

An "agency" does not include:

A Government-controlled corporation
A Member of Congress
An office or committee of either House of Congress or of the two Houses
An office, agency or other establishment in the judicial branch[.]

41 C.F.R. § 301-1.1. In defining an "agency" as "an Executive agency" § 301-1.1 excepts from the definition "Government-Controlled Corporations, i.e., mixed ownership Government Corporations as defined in 31 U.S.C. § 9101." Section 9101 defines two categories of government corporations: "mixed-ownership" government corporations and "wholly owned" government corporations. 31 U.S.C. § 9101. The TVA is defined as a "wholly owned" government corporation and *not* a "mixed-ownership" government corporation. *See* 31 U.S.C. §

6

diems available to Bassett on non-workdays.[4]  Because the regulations providing per diems were incorporated by reference into the General Agreement, TVA argues that Bassett must be charged with actual or constructive knowledge of the regulations.  Since, according to TVA, Bassett had knowledge that per diems were available, TVA asserts that his trips home on non-workdays were voluntary and not compensable under the FLSA.

## B.

The second relevant travel-time exception applies to travel requiring an employee to be away from home overnight.  The regulation found at 29 C.F.R. § 785.39 provides:

> Travel time that keeps an employee away from home overnight is travel time away from home.  Travel away from home is clearly worktime when it cuts across the employee's workday.  The employee is simply substituting travel for other duties.  The time is not only hours worked on regular working days during normal working hours but also during corresponding hours on non-working days.  Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days.

This regulation establishes that travel time away from home is compensable under the FLSA when it occurs during a workday's regular work hours and during those corresponding hours on non-workdays.  Travel away from home as provided for in 29 C.F.R. § 785.39 is not "ordinary home to work" travel time.  As discussed below, however, that travel time is not compensable if it is "voluntary."  *See Bassett*, 2010 WL 716094, at *3-5 (discussing how the travel time described in 29 C.F.R. § 785.39 is not compensable if voluntary).

With this understanding of the applicable law, contracts, and exceptions in place, the

---

9101(3)(N).  Accordingly, because it is not a "mixed-ownership" government corporation, TVA is an "agency" within the definition of that term found in 41 C.F.R. § 301-1.1.

[4] Specifically, TVA claims that 29 C.F.R. §§ 301-11.21 and 301-11.24 are incorporated by reference in to the General Agreement.  Section 301-11.21 provides that covered employees will receive per diems on non-workdays so long as "your travel status requires your stay to include a non-workday."  29 C.F.R. § 301-11.21.  Similarly, § 301.11-24 states that if a covered employee voluntarily returns home on non-workdays, "the maximum reimbursement for round trip transportation and per diem or actual expense is limited to what would have been allowed had you remained at the [remote] location."  29 C.F.R. § 301-11.24.

Court now turns to the merits of TVA's motion, beginning with TVA's jurisdictional argument.

## IV.

In its reply brief in support of summary judgment, TVA, for the first time, argues that the Court lacks jurisdiction to hear this case because Bassett did not exhaust the grievance procedure contained in the General Agreement.[5]  The Court notes that it will often decline to consider arguments raised for the first time in a reply brief.  *See Shaheen v. Yonts*, 5:06-CV-00173-TBR, 2009 WL 87458, at *11 (W.D. Ky. Jan. 13, 2009) (Russell, C.J.); *Keys v. Dart Container Corp. of Ky.*, No. 1:08-CV-00138-JHM, 2012 WL 2681461, at *6-7 (W.D. Ky. July 6, 2012) (collecting cases holding that a court need not consider arguments raised for the first time in a reply brief).  But, because "a litigant may raise a court's lack of subject-matter jurisdiction at any time in the same civil action," the Court finds it necessary to consider TVA's argument, even at this late stage.  *Kontrick v. Ryan*, 540 U.S. 443, 455 (2003) (citing *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Although there is merit to TVA's argument concerning Bassett's contract-based claim, this argument is not dispositive of the entire action.

## A.

Bassett's contract-based claim centers on Section B-X of the General Agreement.  Relying on this section, he argues that TVA contractually agreed to pay for his travel time to and from Paducah on non-workdays, and that the FLSA's wage and hour requirements are enforceable through 29 U.S.C. § 254(b)(1).  In particular, Bassett contends that subsection A.2. makes it "quite clear" that he is owed overtime for travel time on non-workdays.  That subjection

---

[5] Although TVA raises the jurisdictional argument for the first time in its current reply, it previously raised this argument in its reply brief accompanying its first motion for summary judgment.  (*See* Def.'s Reply, DN 32, pp. 2-3.)

states, "An employee required to travel outside of regular bulletined hours of work and on scheduled rest days is paid for time spent in travel at the applicable overtime rate[.]"  (General Agreement, DN 122-2, p. 11.) Because he claims that per diems were not available on non-workdays, Bassets argues that he was "required to travel" on those days within the meaning of subsection A.2.

TVA proposes an alternative interpretation of that subsection.  It argues that the "required to travel language" in A.2. refers only to "the time necessary to journey from the employee's official work station to the project worksite at the beginning of a field assignment and the travel time necessary to return from the project worksite to the employee's official station at the end of a field assignment."  (Def.'s Reply, DN 124, pp. 7-8.)  In other words, an employee is only "require to travel" during the commencing and terminating trips to and from a remote location and is not "required to travel" on non-work days.  Accordingly, TVA claims that the "required to travel" language is ambiguous and subject to more than one potential meaning.  Where the terms of the General Agreement are ambiguous, TVA claims that an employee may not recover under those terms without first exhausting the agreement's grievance procedure.

Section B-VIII – "Grievance Adjustment Procedure" – of the General Agreement sets forth the grievance process an employee must follow if the "employee believes he/she has been treated unfairly or if he/she disagrees with his/her supervisor as to the application of a policy to him/her as an employee[.]"  (General Agreement, DN 32-2, p. 1.)  That procedure contains a number of formal and informal resolution procedures, ultimately, and if necessary, culminating in a decision by an arbitrator.  (*See id.* at pp. 1-4.)  The arbitrator's jurisdiction is "limited to interpretation and application of the terms of the General Agreement and its supplementary schedules," and the arbitrator has no "authority to add to, subtract from, or modify any term or

9

provision of the Agreement[.]"  (*Id.* at p. 4.)  That said, the arbitrator is vested with the authority to determine "how specific language of the General Agreement and supplementary schedules are [sic] to be interpreted," and any decision rendered by the arbitrator "is accepted by both parties as final."  (*Id.*)

The record contains no evidence that Bassett attempted to resolve his contract-based FLSA claim via the General Agreement's grievance procedures.  Courts have consistently held that exhaustion in accordance with the terms of a collective bargaining agreement is a prerequisite to the initiation of legal proceedings.  *See, e.g.*, *Stanfield v. TVA*, 1 F.3d 1242, 1993 WL 272446, at *3 (6th Cir. July 19, 1993) (table decision) (per curiam) ("The exhaustion of contractual grievance and arbitration provision is a prerequisite to initiating an action against an employer for a breach of a CBA." (citing *Alford v. General Motors Corp.*, 926 F.2d 528, 530 (6th Cir. 1991)); *Thurman v. TVA*, 533 F.2d 180 (5th Cir. 1979) (dismissing for failure to exhaust grievance procedures in the "labor-management agreement between the TVA and the Tennessee Valley Trades and Labor Council"); *Luther v. TVA*, 721 F. Supp. 937, 939 (E.D. Tenn. 1989) ("[The plaintiff's] employment was covered by a collective bargaining agreement between TVA and the Tennessee Valley Trades and Labor Council and it is undisputed that [he] failed to file a grievance over his discharge.  TVA argues correctly that this failure to pursue administrative remedies is fatal to the instant suit.").  Because Bassett has failed to show that he exhausted his contract-based claim via the grievance procedures set forth in General Agreement, TVA's motion for summary judgment as to Bassett's overtime wage claim arising under the terms of the General Agreement is **GRANTED**, and Bassett's contract-based cause of action is hereby **DISMISSED**.

## B.

Dismissal of Bassett's contract-based claim is not dispositive of this entire action,

however.  "[W]hile a collective bargaining agreement may indeed require arbitration of statutory claims (like Plaintiff's FLSA claims), thereby barring employees from suing in court, a collective bargaining agreement may only do so if the agreement's arbitration provision *expressly* covers statutory rights."  *Campbell v. Kelly*, No. 3:09-CV-435, 2011 WL 3862019, at *9 (S.D. Ohio Aug. 31, 2011) (emphasis added) (citing *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009)).  Upon review of the General Agreement, the Court can find no provision expressly referring Bassett's statute-based FLSA claim to arbitration.  The General Agreement applies to situations in which an employee believes he has been "treated unfairly" or disagrees with "the application of a policy to" the employee.  (General Agreement, DN 32-2, p.1.)  Nothing in this language expressly brings Bassett's statutory FLSA rights into the terms of the agreement.  Neither party has pointed to any language that would incorporate statutory FLSA claims into the General Agreement nor has the Court discovered such language in its own review.  Accordingly, Bassett's statutory claim remains viable.  This outcome is in accordance with other courts that have dismissed a plaintiff's contract-based claim for failure to exhaust but retained the statutory claim because such claim "requires no interpretation of the CBA."  *Eldred v. Comforce Corp.*, No. 3:08-CV-1171, 2010 WL 812698, at *5-6 (N.D.N.Y. Mar. 2, 2010).

In *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981), the Supreme Court recognized that FLSA plaintiffs could maintain distinct causes of action for contract- and statute-based claims.  The statutory claims need not be exhausted.

> The statutory enforcement scheme [of the FLSA] grants individuals broad access to the courts.  Section 16(b) of the Act, 29 U.S.C. § 216(b), which contains the principle enforcement provisions, permits an aggrieved employee to bring his statutory wage and hour claim "in any Federal or State court of competent jurisdiction."  No exhaustion requirement or other procedural barriers are set up, and no other forum for enforcement of statutory rights is referred to or created by the statute.

*Id.* at 740.  Even though an arbitrator to a collective bargaining agreement may be competent to apply FLSA's statutory provisions,

> [H]e may not have the contractual authority to do so. An arbitrator's power is both derived from, and limited by, the collective-bargaining agreement.  He "has no general authority to invoke public laws that conflict with the bargain between the parties."  His task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties.

*Id.* at 744 (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974)).  Thus, plaintiffs may maintain statutory FLSA actions that are "independent of the collective-bargaining process. [Such claims] devolve on [plaintiffs] as individual workers, not as members of a collective organization."  *Id.* at 745.  For these reasons, Bassett's statute-based FLSA claim may proceed even though his contract-based claim has been dismissed.

## V.

TVA next maintains that that Bassett's statutory claim fails as a matter of law because his travel time on non-workdays was not "work" under the FLSA but rather a personal commuting expense that was a non-compensable incident of employment.  In other words, Bassett's travel time on non-workday was "walking, riding, or traveling to and from the actual place of performance of the principle activity or activities which such employee is employed to perform" and was, therefore, not compensable under the FLSA.  29 U.S.C. § 254(a)(1).  This argument is unavailing because it ignores the Court's previous ruling on the issue and mischaracterizes Bassett's travel time as "ordinary home to work travel."

The four cases that TVA primarily relies upon in arguing that Bassett's travel time was not "work" under the FLSA involve factual situations in which the travel time was categorized as ordinary home to work travel.  *See Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1287 n.3 (10th Cir. 2006) ("[E]ven though the plaintiffs sometimes spent up to seven hours commuting each day, their travel is still ordinary and normal home to work travel if it was a contemplated,

normal occurrence under the employment contract.") (citation omitted); *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 271 (2d Cir. 1999) ("Because [the plaintiff's] extensive travel was a contemplated, normal occurrence under the employment contract entered into between Kavanagh and Grant Union, 28 C.F.R. § 785.35 forecloses Kavanagh's entitlement to compensation under the FLSA."); *Imada v. City of Hercules*, 138 F.3d 1294, 1296-97 (9th Cir. 1998) (rejecting police officers' contention that their travel time was not ordinary home to work travel)[6]; *Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994) ("The travel time was just an extended home-to-work-and-back commute.").   None of these cases involved travel away from home overnight and, therefore, are not on point with the facts currently before the Court.   In denying TVA's first motion for summary judgment, the Court found that "[t]he present case *differs* from 'ordinary home to work travel' in that it involves work at remote locations, requiring members of the dredging crew to spend nights away from home."   *Bassett*, 2010 WL 716094, at *3 (emphasis added).   Accordingly, TVA's first argument in favor of summary judgment is unavailing because the Court has already determined that Bassett's travel time was not ordinary home to work travel, which is precluded from FLSA coverage by 29 U.S.C. § 254(a)(1) and 29 C.F.R. § 785.35. Although Bassett's travel time was something other than "ordinary home to work travel," this does not mean that it is automatically compensable.   His travel time could still fall outside of FLSA coverage if it was voluntary.   The Court next considers whether Bassett's travel time was voluntary.

## VI.

At this point in the analysis, a genuine issue of material fact may exist regarding whether

---

[6] *Imada* also briefly addressed the officers' claim that their travel was compensable as "travel away from home" under 29 C.F.R. § 785.39, but summarily affirmed dismissal of that claim because the officers' travel time did not cut across the normal workday or the corresponding hours on nonworking days."   *Imada v. City of Hercules*, 138 F.3d 1294, 1297 (9th Cir. 1998) (citing 29 C.F.R. § 785.39).

Bassett's travel time on non-workdays is compensable as travel away from home under 29 C.F.R. § 785.39.  As the Court previously pointed out, however, "[t]his regulation fails . . . to discuss travel that is purely voluntary," and "an employee need not be compensated for voluntary travel time even if working at a remote location."  *Bassett*, 2010 WL 716094, at *3-4.  In the process of denying TVA's first motion for summary judgment, the Court framed the voluntariness issue as follows:

> In determining whether [Bassett's] travel was voluntary or not, the true issue is whether [TVA] offered to pay employees' living expenses while they were at remote work sites on non-working days, and whether [Bassett] and other employees were aware of that option.  If such an option existed and was made known to employees, then the travel time spent driving home from remote work sites could only be classified as "voluntary," and [Bassett] would not be entitled to compensation.  If, however, [TVA] never offered a per diem to its employees on non-working days, or such a policy existed but was never made known to employees, [Bassett] may be entitled to compensation for the "required" travel time home.

*Id.* at *4; *See Mendez v. Radec Corp.*, 232 F.R.D. 78, 88 (W.D.N.Y. 2005) ("Radec may well have 'wanted' its employees to stay in the vicinity of the job sight throughout the project's duration, but if Radec was unwilling to back up that wish with an offer [to] pay for its employees' housing on non-working days, the employees' decision to travel home at the conclusion of their week cannot fairly be characterized as purely 'voluntary.'").  After the benefit of additional discovery, TVA again moves for summary judgment, arguing that the evidence shows per diems were available to employees on non-workdays at remote projects and that their availability was made known to Bassett.  As a result, TVA contends that no genuine dispute exists and that Bassett's travel on non-workdays was voluntary and, therefore, not compensable.

## A.

Upon review of the evidence, the Court finds that per diems were available to TVA employees on non-workdays at remote projects.  The Court's conclusion is based on two

considerations: 1) the applicability of the Federal Travel Regulations to TVA and its employees, and 2) the incorporation-by-reference language in the General Agreement, Bassett's regularly submitted travel reimbursement forms, and Accounting Procedure 15 of TVA's Travel Manual.

First, the Federal Travel Regulations found in 41 C.F.R. Chapters 300 through 304, establish that per diems were available to TVA employees on non-workdays at remote projects. The regulations in those chapters implement the "statutory requirements and Executive branch policies for travel by Federal civilian employees and others authorized to travel at Government expense." 41 C.F.R. § 300-1.1. As discussed above in footnote three, the regulations found in Chapter 301 – "Temporary Duty (TDY) Travel Allowances" – apply to TVA and its employees because it is an "agency" as that term is defined in the regulation. *See* 41 C.F.R. § 301-1.1. Of particular importance is the regulation found at 41 C.F.R. § 301.11-21(a), which provides:

> **Will I be reimbursed for per diem or actual expenses on leave or non-workdays (weekend, legal Federal Government holiday, or other scheduled non-workdays) while I am on official travel?**
>
> (a) In general, you will be reimbursed as long as your travel status required your stay to include a non-workday, (e.g., if you are on travel through Friday and again starting Monday you will be reimbursed for Saturday and Sunday), however, your agency should determine the most cost effective situations (*i.e.*, remaining in a travel status and paying per diem or actual expenses or permitting your return to your official station).

The plain language of this regulation demonstrates that per diems were available to TVA employees on non-workdays at remote locations. Other regulations in the same chapter reiterate this point. For example, 41 C.F.R. § 301.11-24 states:

> **What reimbursement will I receive if I voluntarily return home or to my official station on non-workdays during my TDY assignment?**
>
> If you voluntarily return home or to your official duty station on non-workdays during a TDY assignment, the maximum reimbursement for round trip transportation and per diem or actual expense is limited to what would have been allowed had you remained at the TDY location.

In other words, § 301.11-24 provides that if an employee returns home on non-workdays, the maximum reimbursement available is the per diem amount that would have been paid if he had remained at the remote protect on the non-workdays.  In all, the Federal Travel Regulations make it clear that per diems were available to TVA employees on non-workdays at remote projects.

Second, the evidence shows that per diems were available to Bassett on non-workdays because the travel regulations were incorporated by reference into the General Agreement, Bassett's travel reimbursement forms, and Account Procedure 15 of TVA's travel manual.  As discussed previously, Section B-XVI of the General Agreement – "Nonnegotiated Items Established by Federal Laws and Regulations" – states:

> Annual employees are granted benefits *in accordance with applicable federal laws and regulations* on the following subjects . . . 5. Official travel . . . .

(General Agreement, DN 116-8, p. 4) (emphasis added).  Clearly, 41 C.F.R. Chapter 301 is incorporated into the General Agreement by this language.  Bassett's travel reimbursements contain similar incorporation language.  A reimbursement form from January 4, 2007, states:

> I certify that this report contains an accurate description of official travel performed and request reimbursement *under applicable travel regulations*.  I have not been reimbursed for these expenses.

(Mar. 10, 2011 Basset Dep., DN 116-2, p. 24:6-9) (emphasis added).  Finally, several versions of Accounting Procedure 15 found in TVA's Travel Manual state:

> **FEDERAL TRAVEL REGULATIONS**
>
> For travel allowance and reimbursement circumstances not addressed in this procedure, *TVA follows the applicable provisions of the Federal Travel Regulations (49 CFRP-Part 301).*

(Jones Decl., DN 111-14, pp. 14, 29, 41, 56, 76 (emphasis added)).  Because the travel

regulations that apply to TVA make per diems available to employees on non-workdays, and because the General Agreement and TVA's policies and procedures incorporate those regulations by reference, it is clear to the Court that per diems were available to TVA employees on non-workdays.  This does not end the inquiry, however.  Simply because the regulations and TVA's policies state that per diems were available on non-workdays does not mean that employees had knowledge of such regulations and policies.  If Basset did not have knowledge of the regulations, then his travel time on non-workdays could still be found to be involuntary.  Additionally, remaining evidence shows that even if Bassett knew per diems were available, his supervisors may have refused to pay per diems on non-workdays, so that Bassett could not collect them even if available pursuant to TVA policy.

**B.**

After reviewing the record, the Court finds that a genuine dispute remains as to whether Bassett had knowledge of TVA's policy that provided per diems to employees on non-workdays at remote projects.  Additionally, there is a genuine dispute as to whether Bassett's supervisors refused to provide him per diems on non-workdays, so that Basset could not collect per diems even if available under the policies.  For this reason, summary judgment is inappropriate.

**1.**

TVA relies on the following evidence when arguing that Bassett had knowledge of its policies providing per diems on non-workdays.  Janet Jones, the TVA manager "responsible for the implementation and development of TVA's employee travel policies," filed a declaration with the Court stating that TVA's "travel policies, as well as the Federal Travel Regulations, apply to all TVA employees."  (Jones Decl., DN 111-14, ¶¶ 3, 5).  Furthermore, "TVA employees are able to access these policies electronically through TVA's 'Insidenet.'  TVA employees can also access these policies through their respective Human Resource representatives and managers."  (*Id.* ¶ 5).

17

TVA points to the "Affidavit of Appointment and Conditions" that Bassett signed when he was first hired by TVA in 1987.  That document states that Bassett understood his employment to be "subject to the terms and conditions of existing law and TVA agreements and policies, including those governing wage and salary assignments, and such modifications and additions thereto as TVA determines to be necessary or desirable to carry out the Tennessee Valley Authority Act, as amended."  (Aff. of Appointment and Conditions, DN 111-17, p. 2).  TVA relies upon travel reimbursement forms signed by Bassett in which he requests reimbursement "under applicable travel regulations."  (*See, e.g.*, Mar. 10, 2011 Bassett Dep., DN 116-2, p. 24:6-9).  The General Agreement between Bassett's union and the TVA also contains similar language, which incorporates the "applicable federal laws and regulations on . . . Official travel" into the agreement.  (General Agreement, DN 116-8, p. 4).  Perhaps most importantly, Larry Radford, the manager of the Project Services branch of the Heavy Equipment Division and one of Bassett's supervisors testified in his deposition that:

> We [TVA] were set up that you [TVA employees] would be paid travel going to the project, to the dredging project, you would be paid travel for after bulletin hours . . . when that project was done, but on the weekends in between times, while the project was still going on, you had the right to stay at the motel and we would pay you per diem, the motel and the food[,] or we would pay your mileage on your personal vehicle if you wanted to drive home[.]

(Radford Dep., DN 116-3, pp. 34:22-35:5).  When asked if he told employees about TVA's policy or otherwise described it to them, Radford responded, "I told all of them that's ever worked on it, every one of them, that's ever worked on the dredge, I have told this, the ones that were the annual trades and labor employees."  (*Id.* at p. 39:14-17).  To support Radford's assertion that he told TVA employees that per diems were available on non-workdays, TVA cites to an email exchange between Radford and another TVA employee, Bob Gilchrist.  (*See* McCarter Decl., DN 116-10, p. 2).  Those emails dated September 2008 reveal that Radford told

Gilchrist that per diems were available on non-workdays.  (*Id.*).  This and other evidence in the record supports TVA's assertion that Bassett knew of its policy providing per diems on non-workdays at remote projects.

**2.**

In contrast to the foregoing evidence, Bassett rebuts TVA's assertion with the following evidence.  First, Bassett testified in his deposition that he was never actually aware that per diems were available for room and board on non-workdays at remote projects.

> Q:      So is it your testimony then that if you stayed on the weekends or the rest days, whenever those may be, that you [would] be staying as you understand it at your own expense, not with TVA reimbursing you for lodging and meals?
>
> A. [Basset]:  That is correct.

(Pl.'s Resp., DN 122, p. 8 (quoting Mar. 10, 2011 Basset Dep., pp. 57-58).)

> Q:      Did they [TVA mangers Roy Galyon and Larry Radford] ever in any of those conversations say, hey guys, no we're not paying it [travel time on non-workdays] but if you want to stay, we'll pay your meals and your motel?
>
> A. [Basset]: There was no but.  They weren't paying it and that was it.

(*Id.* at p. 9 (quoting Mar. 10, 2012 Basset Dep., pp. 60-61).)

> Q:      In this litigation, TVA has asserted that you and the other members of the dredge crew had a right to receive per diem on your rest days for lodging and meals.  Did anyone at TVA ever make that offer to you?
>
> A. [Bassett]: No.

(*Id.* (quoting Mar. 10, 2011 Basset Dep., pp. 55-56).) Furthermore, Bassett, in an affidavit, swore, "I was not given the choice between receiving a per diem for each of my days off and voluntarily traveling home to Paducah.  I traveled home to Paducah because I was not going to receive a per diem to stay at the work station . . . ."  (Bassett Aff., DN 111-15, ¶ 7.)  It must be

noted, however, that Bassett is able to recall one occasion on which he was offered a per diem for a non-workday:

> Q:        Was there ever a time in your entire tenure with TVA in which a supervisor to you offered to pay lodging on a rest day, night or meals on a rest day?
>
> A. [Bassett]: I recall one time.  I think it was around 2004, 2005 we were at Johnsonville working two shifts and it started snowing.  Larry Radford called me and told me to let the guys on the day shift go home early, so I did, and when the evening shift come I, he said that – they said they wanted to go home too since we let the day shift go home.  He told me to tell them that he would pay the motel bill that night if they would stay.
>
> Q:        And would the next day have been a typical rest day?
>
> A. [Bassett]: Yes sir.
>
> Q:        Other than that one occasion with the [inclement] weather, was the offer to pay for per diem on the rest days, either meals or lodging, ever made to you or to your knowledge to any other member of the dredge crew?
>
> A. [Basset]: No sir.

(Pl.'s Resp., DN 122, pp. 7-8 (quoting Mar. 10, 2011 Bassett Dep., pp. 55-56).)  It appears that Bassett received the per diem allowance on this one occasion as a safety measure because of inclement weather and not pursuant to TVA travel policy.

Upon review of this testimony, the Court finds that there is a genuine dispute of material fact regarding whether Bassett knew per diems were available to him on non-workdays.  He testified that he had no such knowledge.  Larry Radford, Bassett's manager, testified that he told all the employees that per diems were available on non-workdays.  In light of this conflicting testimony, the Court cannot say that there is no genuine dispute of material fact on the issue of Bassett's actual knowledge.  Therefore, summary judgment is inappropriate.

Second, summary judgment is also inappropriate because there is a genuine issue of

material fact regarding whether Bassett should have known that per diems were available.  TVA

has argued that Bassett had constructive knowledge that per diems were available because the

Federal Travel Regulations were incorporated by referenced into TVA's policies and the General

Agreement.  When asked about his access to TVA's policies, Bassett testified as follows:

> Q:         Mr. Basset, have you ever pulled a TVA policy or procedure on anything or
> did you pull the policy or procedure on anything during your TVA tenure?
>
> A: [Basset]:  No sir. I worked in the field.  I did not work in the plant.

(Pl.'s Resp., DN 122, p. 22 (quoting Mar. 10, 2011 Bassett Dep., p. 64)).   Regarding his

knowledge of Accounting Procedure 15 of TVA's Travel Manual, Bassett testified:

> Q:         Now, Mr. Slater went through with you Exhibits 11 through 15
> which you indicated and agreed with him that represents documents
> over the years called "Travel Manual, Accounting Procedure 15."
> Do you recall those questions from Mr. Slater?
>
> A. [Bassett]: Yes.
>
> Q:         Did anyone at TVA when the topic came up about time spent in
> travel ever refer you to or mention the applicability of Accounting
> Procedure 15?
>
> A. [Bassett]: No sir.
>
> Q:         And he asked you about when you might have seen this.  Do you
> recall when you might have seen Accounting Procedure 15 or in
> what context?
>
> A. [Bassett]: I could not say so.  When I was hired in, first day I was hired in, I
> signed so many documents that I don't know if it was one of them or
> not.
>
> Q:         When you or the other members of the dredge crew raised the issue
> about what you asserted as unequal treatment regarding being paid
> for your time spent travelling on rest days, were you ever referred to
> any policy or any accounting procedure or anything else?
>
> A. [Bassett]: No sir.

(*Id.* at p. 8 (quoting Mar. 10, 2011 Bassett Dep., pp. 57-58).)  Although there is evidence that the

Federal Travel Regulations were applicable to Bassett through TVA's policies and procedures, Bassett's testimony is that he was not aware of such policies and that they were never presented to him.  There is sufficient evidence to create a genuine dispute as to whether Bassett had constructive knowledge of the policies.

Finally, summary judgment is inappropriate because Bassett has presented evidence that even if he had actual or constructive knowledge that per diems were available on non-workdays, his supervisors repeatedly told him and other employees that they could not seek reimbursement for such expenses.  Therefore, he did not believe that his supervisors would have approved his travel reimbursement forms even if he sought reimbursement for per diem expenses on non-workdays.  The various versions of Account Procedure 15 in TVA's Travel Manual provide:

**Supervising Official Responsibility**

The responsible supervising official is the traveler's immediate supervisor or another person as designated by the organization, who is familiar with the employee's travel assignment.

The supervisor is responsible for:

(A) Authorizing travel to the extent necessary and prudent in the conduct of official business.

(B) Ensuring that each traveler is informed of his/her responsibilities.

(C) *Signing or electronically approving the requests* for reimbursement to the extent expenses are prudently incurred and are reasonable, in compliance with the instructions, travel authorizations, and supervisor's instructions, and to the extent they are compatible with other associated records such as travel reports and leave slips.

((Jones Decl., DN 111-14, pp. 5, 22, 34-35, 47, 65 (emphasis added); *Id.* at p. 83 (stating supervisors' responsibilities in a different manner but with the substantially the same meaning).) Throughout his deposition, Bassett testified that Larry Radford and other supervisors told him and other members of the dredging crew that they would only be paid a mileage allowance on

non-workdays and nothing else.  (Pl.'s Resp., DN 122, pp. 6-7 (quoting Mar. 10, 2011 Bassett Dep., pp. 12-13, 15).)  Accordingly, Bassett argues that even if he had actual or constructive knowledge that per diems were available on non-workdays, Larry Radford and other supervisors made it clear that they were not going to pay for such expenses.  By implication then, Bassett claims that the supervisors would never have signed the reimbursement forms as required by Accounting Procedure 15.  The Court finds that this evidence establishes that a genuine dispute of material fact exists regarding the availability of per diems in this case.

## CONCLUSION

Defendant Tennessee Valley Authority moved the Court for entry of summary judgment against Plaintiff Douglass Bassett.  For all of the foregoing reasons, TVA's motion is **GRANTED IN PART** and **DENIED IN PART**.  Bassett's contract-based claim is **DISMISSED**, while his statute-based claim will proceed consistent with the rulings in this opinion.